ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

JOSEPH TARTAKOVSKY (CABN 282223)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7230
    Fax: (415) 436-7234
    Joseph.Tartakovsky@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>DARNELL HOUSTON,<br><br>    Defendant. | CASE NO.: 3:21-CR-00290-WHO<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>Sentencing: April 20, 2023 at 1:30 p.m.<br>Court:    Hon. William H. Orrick |

On June 9, 2021, the United States charged Darnell Houston, by Complaint, with being a felon in possession under 18 U.S.C. § 922(g)(1). On July 27, 2021, a two-count Indictment charged violations of 18 U.S.C. § 922(g)(1), for Felon in Possession of a Firearm and for Felon in Possession of Ammunition. On February 24, 2022, the defendant pleaded guilty to Count One of the Indictment.

### I.    OFFENSE CONDUCT

On April 25, 2021, San Francisco Police Department officers responded to a call of shots fired at 125 Hyde Street. Presentence Report ¶ 6. They found multiple fired shell casings at the scene. Video surveillance footage showed that, around 5:25 pm, defendant Darnell Houston, then working Urban Alchemy, was approached by three unknown suspects as he stood in front on 125 Hyde Street. Some

sort of altercation took place. Houston removed his vest as if to prepare for a fight. One of the unknown suspects removed a handgun from his front hoodie pocket or waistband, pointed it at Houston's feet, and fired a shot. Houston jumped back and the bullet grazed his leg. The three unknown suspects began walking away from Houston, northbound on Hyde Street. PSR ¶ 7.

Seconds later, Houston ran and retrieved a gun from the passenger side of his dark gray Chevy Camaro. Houston, pictured at left and below, then ran after the suspects, northbound on Hyde Street, and fired eight shots.

Meanwhile, the suspect who fired at Houston took a crouching position with a two-handed grip on his own gun. The second unknown suspect ran toward the east side of Hyde Street and then turned and pointed his arms out in front of him, toward Houston. It appears that this suspect was also holding a gun with both hands. His arms and upper body recoil as if in response to a firearm being shot.



UNITED STATES' SENTENCING MEMORANDUM
3:21-CR-00290-WHO                                    2

Hyde Street was filled with pedestrians and passing cars. As Houston fired, bystanders scattered and dove to the ground. (See image at left.) Pedestrians and a person in an electric mobility device, nearby one of Houston's assailants (and targets), were in Houston's line of fire. (See image below, with an unknown suspect, in the hoodie to their left.) Houston then ran toward his Camaro, got in, and drove off.

On May 18, 2021, SFPD and ATF officers and agents executed a search warrant on Houston's home and found a Polymer 80 9mm firearm and a Smith & Wesson .40 caliber firearm. Both had loaded magazines. In the apartment were also boxes of ammunition. PSR ¶ 9.



Houston was interviewed, after Miranda warnings, and identified the firearms found in his apartment. He claimed that he "found" them in Oakland a "couple of months" ago. When asked about the shooting incident on Hyde Street, Houston said that he was at "work" when he was approached by the three unknown people. Houston thought that they wanted to fight until he saw that one of them had a gun. Houston told the officer that the individual shot at him and showed the officer a mark on his leg that Houston said was a bullet graze. PSR ¶ 10.

The SFPD Forensics Services Division, using the National Integrative Ballistic Information Network ("NIBIN"), compared ballistic evidence from the Hyde Street shooting scene and ballistic evidence from the firearms recovered from Houston's apartment. An association was made between the .40 caliber fired casings, located by investigators on Hyde Street on April 25, and the Smith & Wesson

handgun located during the search warrant of Houston's apartment.

### III. SENTENCING GUIDELINES CALCULATION

The government, defense, and Probation all calculate the Guidelines as follows:

| | | |
|---|---|---:|
| a. | Base Offense Level, U.S.S.G. § 2K2.1(a)(6)(A): | 14 |
| b. | Specific offense characteristics under U.S.S.G. Ch. 2 | +4 |

> § 2K2.1(b)(6)(B): Defendant used or possessed any firearm or ammunition in connection with another felony offense (e.g., Cal. Penal Code § 246.3(a) ["any person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a public offense"]); or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense.

| | | |
|---|---|---:|
| c. | Acceptance of Responsibility: | -3 |
| d. | Adjusted Offense Level: | 15 |

The government concurs with Probation's Criminal History Category calculation (II), and its recommendations as to a fine, restitution, and the special assessment.

### IV. RECOMMENDATION

Mr. Houston's Guidelines range is 21-27 months. The government moves for a downward variance, to 18 months. Mr. Houston engaged in a gunfight in the middle of the day on a crowded street in downtown San Francisco.

Aside from the mystery (to the government, at least) of why he was accosted in the first place, the government credits the basic account of this incident: Houston was confronted, shot at, injured. He was in pain. He saw red. He ran for his weapon. He chased the perpetrators. He opened fire.

What follows are a few considerations about what to make of this conduct.

*First*, Mr. Houston has three prior state felony convictions for firearm-related offenses, including one for carrying a loaded firearm in public. For these offenses, Houston was sentenced to one year of imprisonment. This was in 2011. Yet a decade later, unfortunately, he showed that he was still determined to possess a loaded gun—and, worse, that he was willing to use it.

*Second*, Mr. Houston suggested to an arresting officer that he acted in self-defense. Was it self-

defense?  Houston shot at men who, by that point, were nearly a half block away and headed away from him.  The confrontation had ended.  Instead, Houston went to his car, opened the door, snatch his weapon, and pursued them down the block, firing while running.  Houston went on the offensive.



*Third,* Houston acted with breathtaking recklessness: he discharged multiple rounds at distant targets on a crowded street on a weekday afternoon.  Everyone is lucky that no pedestrians were hurt or worse.  There was property damage that someone other than Houston will have to pay for. (See image at right of car hit by Houston's bullets.)

*Fourth*, Houston was working for Urban Alchemy that afternoon.  His role, he told an officer after his arrest, was to "interact with the community" and be part of a "positive program" to help people who "need someone to talk to."  Footage of the shooting shows Houston wearing the Urban Alchemy uniform shortly before he is confronted by the unknown men.  According to Urban Alchemy records, on April 25, Houston was "assigned" to the Larkin Street Youth Center at 129 Hyde Street.  These same records state the following:

> **Description of Incident:** On 4/25 at approximately 4:40pm [less than an hour before the incident], Darnell Houston was assigned to the Larkin Street Youth Center at 129 Hyde St. when he observed a man and a woman arguing. The woman was pregnant. Darnell approached the man. An argument ensued.  The man pushed Darnell and swung on him. Darnell and the man began a physical altercation.
>
> **Supervisor Comments:** Company policy mandates that our practitioners are not to engage in physical altercations. Darnell could have de-escalated the situation by backing off. Instead he escalated the situation into a physical altercation violating company policy.  [HOU-000384]

*Fifth,* on the day of the shooting, Houston, attempting evade responsibility, lied to SFPD officers.  Soon after the shooting police spoke to Houston.  He had been identified as a witness by his Urban Alchemy supervisor.  Houston, despite some hesitation, portrayed himself to police as a mere bystander.  He said he was working on Hyde when three subjects arrived on scene and he

heard shots. Houston didn't see a firearm, he added, and believed he was not the target of the shooting. He claimed that he hadn't been injured and was nervous and left the scene. But he also said, according to the police report, that, "to his understanding," before the shooting, there was an altercation between a man and a pregnant woman but that Houston was not sure what happened. HOU-000075. In the end, then, Houston may not have been confronted as "unexpectedly" as he has said. And his shots fired may not have been his only act of aggression that day.

## V. CONCLUSION

For the forgoing reasons, the government recommends a sentence of 18 months' imprisonment.

DATED:	April 13, 2023	Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney


 */s Joseph Tartakovsky*
JOSEPH TARTAKOVSKY
Assistant United States Attorney